UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM & DOUGLAS PARTNERS INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CASE NUMBER: |
| TEIKAMETRICS INC., | ) ) ) |
| Defendant. | ) ) |

**COMPLAINT AND JURY DEMAND**

### I. INTRODUCTION

This is a fraud case. In December 2020, self-proclaimed Amazon.com ("Amazon") advertising expert Defendants Teikametrics Inc. ("Teikametrics") pitched its Amazon demand-side platform ("Amazon DSP") management services to third-party Amazon seller Plaintiff William & Douglas Partners Inc. ("William & Douglas"). Teikametrics hyped its services as ideal for third-party sellers like William & Douglas. It assured William & Douglas that its Amazon-DSP advertisements would drive traffic directly to its product listings and lead to direct sales and that it would track direct-to-William & Douglas'-products metrics, including return on advertising spend ("ROAS"). Teikametrics' promises enticed William & Douglas to spend as much as possible on monthly service contracts with Teikametrics. To spur William & Douglas' spending each month, Teikametrics boasted that its services were delivering William & Douglas massive returns — an average monthly ROAS of nearly 7x (with a single monthly high of 13x) and average monthly product sales of over $200,000 (with a single monthly high of over $334,000).

None of it was true. After 18 months and spending over $550,000, William & Douglas learned that, by design, Amazon DSP is seller agnostic: an Amazon-DSP advertisement links potential customers to specific Amazon product listings but not specific sellers. For products with multiple sellers — like many products William & Douglas sells — this means that Amazon-DSP advertisements often drive potential customers to William & Douglas' direct competitors. Adding insult to injury, William & Douglas discovered that the ROAS and product sales numbers that Teikametrics shared each month included thousands of products that William & Douglas not only did not sell exclusively but also did not sell at all. The products it did sell yielded a negligible — and, even negative for several months — ROAS, resulting in significant profit losses for William & Douglas. But given Amazon DSP's architecture, William & Douglas' true ROAS is unknowable. Had Teikametrics been truthful about these facts, William & Douglas would have never contracted with it or spent substantial sums each month renewing the contract.

William & Douglas brings this action against Teikametrics for intentional misrepresentation (fraud/deceit/fraudulent inducement), negligent misrepresentation, breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, and violation of G.L. ch. 93A, § 11. William & Douglas seeks compensatory damages, consequential damages, treble damages, interest, costs, and attorney's fees.

## II.     JURISDICTION AND VENUE

1. Subject-matter jurisdiction exists under 28 U.S.C.A. § 1332 because this action arises between citizens of different states and the amount in controversy exceeds $75,000.

2. Personal jurisdiction exists under the United States Constitution's Due Process Clause and G.L. ch. 223A, § 2, because Teikametrics' principal place of business is in Massachusetts.

3. Venue is proper under 28 U.S.C.A. § 1391 because Teikametrics' principal place of business is in this district.

### III.     PARTIES

4. Plaintiff William & Douglas Partners Inc. is a Virginia corporation with a principal place of business in Alexandria, Virginia; is in the business of reselling products on Amazon; and is a party to at least 20 contracts with Teikametrics.

5. Defendant Teikametrics Inc. is a Delaware corporation with a principal place of business in Boston, Massachusetts; is in the business of developing, marketing, and selling retail-optimization software to third-party sellers; and is a party to at least 20 contracts with William & Douglas.

### IV.     FACTS

*William & Douglas*

6. William & Douglas is a third-party seller of thousands of holiday- and pop-culture-themed party, decoration, décor, apparel, and toy products on Amazon, with retail prices ranging from $4.99 to $97.91.

7. William & Douglas' Amazon storefront and examples of its products are:



8. William & Douglas nearly exclusively sells other brands' products, not its own.

9. An example of a William & Douglas Amazon product listing is:



10. Most products that William & Douglas sells on Amazon are not exclusive; often, many other third-party sellers — as many as 12 — also sell the same products on Amazon.

11. An example of a William & Douglas Amazon listing for a product that many — in this example ten — other third-party sellers are also selling is:



12. To identify, organize, and track products, Amazon assigns each product listed for sale on its platform a unique Amazon Standard Identification Number ("ASIN").

5

13. ASINs are product — not seller — specific: multiple sellers of the same product share one ASIN for that product.

14. An example of a William & Douglas Amazon product listing ASIN is:

**Product details**
Package Dimensions : 9.09 x 8.94 x 2.28 inches; 10.23 Ounces
Date First Available : August 13, 2020
Manufacturer : amscan
ASIN : B08FVD99C4
Customer Reviews:
★★★★½  242 ratings

*Amazon DSP*

15. To centralize and automate the digital-ad-buying process, Amazon designed and developed a demand-side-platform software solution (*i.e.*, Amazon DSP) that allows advertisers to buy advertising space through a single interface.

16. Unlike other demand-side platforms, Amazon DSP allows Amazon sellers to buy advertisement placements for their products both on and off Amazon (*e.g.*, third-party websites) to expand their brand awareness and attract customers not already shopping on Amazon.

17. Amazon-DSP-advertisement forms include desktop-display advertisements, mobile-banner advertisements, mobile-interstitial advertisements, image-and-text advertisements, and in-stream-video advertisements.

18. An example of an Amazon-DSP advertisement on a third-party website (IMDB.com) is:



19. Amazon DSP works for Amazon sellers by collecting data from all over the web about potential customers' interests, demographics, and purchase history and using that data to create customer profiles, which it then uses to target advertisements to individuals likely to be interested in the Amazon sellers' products.

20. Amazon-DSP advertisements link potential customers to specific Amazon product listings (*i.e.*, ASINs) but not specific sellers of those products.

21. Because Amazon-DSP advertisements link only to specific products and not specific sellers, third-party sellers of products with multiple other sellers cannot rely on or guarantee that Amazon-DSP advertisements link potential customers to their specific product listings; often, Amazon-DSP advertisements link potential customers to other sellers' listings of the same products, taking potential product sales away from the third-party seller who bought the Amazon-DSP advertisements and enriching their competition.

22.     Amazon tracks Amazon-DSP-advertisement conversion and performance metrics on an ASIN-basis (*i.e.*, product — not seller — specific basis).

23.     Because Amazon-DSP-advertisement metrics are ASIN-based, it is impossible for third-party sellers of products with multiple other sellers to know exactly how many potential customers its Amazon-DSP advertisements linked to their product listings versus other sellers' listings of the same products; it is therefore impossible for third-party sellers of products with multiple other sellers to track and determine a ROAS for any Amazon-DSP-advertisement campaign.

24.     Given Amazon DSP's design — including an unknowable ROAS and the potential to significantly benefit sellers' competition — it is meant for brand owners, private labels, and sellers with exclusive sale rights; it is not an appropriate or effective advertising tool for third-party sellers of products with multiple other sellers like William & Douglas.

*Teikametrics Pitches Its Amazon-DSP-Management Services to William & Douglas*

25.     Teikametrics is a Boston-based technology company founded in 2011 providing digital-ad-management services to Amazon sellers.

26.     In December 2020, Teikametrics approached William & Douglas with its technology-based Amazon-DSP-management services, which include researching, designing, developing, optimizing, and tracking Amazon-DSP-advertisement campaigns.

27.     In pitching Teikametrics' Amazon-DSP-management services to William & Douglas, Teikametrics represented and held itself out as an Amazon-DSP-advertising expert; Teikametrics' website also promotes itself as an Amazon-advertising expert:



28. Teikametrics represented to William & Douglas that Amazon DSP was an appropriate and effective advertising tool for third-party sellers of products with multiple other sellers like William & Douglas.

29. Teikametrics represented to William & Douglas that its Amazon-DSP advertisements would link potential customers directly to its product listings.

30. Teikametrics represented to William & Douglas that its Amazon-DSP advertisements would not link potential customers to any of its competitors' product listings.

31. Teikametrics represented to William & Douglas that its Amazon-DSP advertisements would result in direct sales for William & Douglas.

32. Teikametrics represented to William & Douglas that its Amazon-DSP advertisements would not result in direct sales for its competitors selling the same products.

33. Teikametrics represented to William & Douglas that its Amazon-DSP-advertisement conversion rates, ROAS, and any other direct-to-William & Douglas'-products metrics were measurable and knowable and would be tracked and shared with it monthly.

### *William & Douglas and Teikametrics Enter into 20 Contracts for Teikametrics' Amazon-DSP-Management Services*

34. On January 4, 2021, William & Douglas and Teikametrics entered into a contract for Teikametrics' Amazon-DSP-management services ("Contract"). *See* Exhibit A (the Contract).

35. The Contract term expired monthly, with William & Douglas' option to renew at the end of each month. *See id.* at § 4.

36. Under the Contract, William & Douglas expressly retained the right to cancel the Contract and Teikametrics' Amazon-DSP-management services at any time. *See id.*

37. Under the Contract, William & Douglas could spend as much or as little on Teikametrics' Amazon-DSP-management services as it chose each month. *See id.*

38. Between January 2021 and July 2022, William & Douglas renewed the Contract 20 times — each with varying amounts of Amazon-DSP-management services provided and consideration paid for those services (together, the "Divisible Contracts").

39. In renewing the Divisible Contracts each month, Teikametrics represented to William & Douglas that the more William & Douglas spent on Teikametrics' Amazon-DSP-management services, the higher ROAS William & Douglas would receive, and urged William & Douglas to spend as much as possible each month.

40. To prompt William & Douglas' continued spending and before renewing the Divisible Contracts each month, Teikametrics represented that its Amazon-DSP-management services were resulting in an average monthly ROAS of nearly 7x (with a single monthly high of 13x) and average monthly product sales of over $200,000 (with a single monthly high of over $334,000) for William & Douglas.

41. From January 2021 through July 2022, William & Douglas spent over $550,000 on Teikametrics' Amazon-DSP-management services.

***William & Douglas Learns that Teikametrics Misrepresented Its
Amazon-DSP-Management Services and Metrics, and Terminates the Divisible Contracts***

42. In June 2022, after an internal accounting, William & Douglas discovered that it was not achieving the high-performing ROAS and sales metrics that Teikametrics had been representing to it each month before renewing the Divisible Contracts.

43. William & Douglas learned that the ROAS and sales metrics that Teikametrics represented each month were actually "total return on ad spend" ("TROAS") metrics, which were subject to a "brand-halo effect" and included not only the sales and ROAS for other sellers of the products William & Douglas sells but also other products sold for the brands of products that William & Douglas sells.

44. In other words, William & Douglas learned that the ROAS and sales metrics that Teikametrics represented each month included thousands of products that William & Douglas not only does not sell exclusively but also does not sell at all — only about 10% of all the products included in the ROAS and sales that Teikametrics represented each month (*i.e.*, the TROAS) were products that William & Douglas sold.

45. William & Douglas learned that the ROAS for only the products that it sold averaged only about 1.5 — with a negative or break-even ROAS for several months — resulting in a substantial profit loss for William & Douglas each month.

46. But William & Douglas also learned that Amazon tracks Amazon-DSP-advertisement product ROAS on an ASIN-basis (*i.e.*, product — not seller — specific basis), and therefore not only was the William & Douglas-product ROAS likely much lower than an average of 1.5 — as it also included sales for many of its competitors — but also that its true ROAS was unknowable.

47. Had William & Douglas known Amazon DSP's true architecture, Teikametrics' Amazon-DSP-management services' true value, that its true ROAS was substantially less — sometimes a loss — than Teikametrics represented each month, and that its true ROAS was unknowable, William & Douglas would have never entered into the Contract or the Divisible Contracts with Teikametrics.

48. On July 4, 2022, after discovering Teikametrics' misrepresentations, William & Douglas informed Teikametrics that it desired to cease Teikametrics' Amazon-DSP-management services, and William & Douglas later terminated the Divisible Contracts.

### *Teikametrics Also Fails to Provide William & Douglas Sponsored-Brand-Video Advertisements Per a Separate Agreement*

49. In addition to buying Teikametrics' Amazon-DSP-management services, William & Douglas also entered into an agreement with Teikametrics to generate and publish sponsored-brand-video advertisements on William & Douglas' Amazon product listings ("Video Contract").

50. Under the Video Contract, Teikametrics agreed to publish sponsored-brand-video advertisements on William & Douglas' Amazon product listings only when those products were in stock and available from William & Douglas.

51. William & Douglas learned that Teikametrics often published sponsored-brand-video advertisements on William & Douglas' Amazon product listings that were out of stock or unavailable from William & Douglas but available from other sellers.

52. William & Douglas learned that it had paid Teikametrics and/or Amazon at least $30,000 for sponsored-brand-video advertisements that were published on William & Douglas' Amazon product listings that were out of stock or unavailable from William & Douglas but available from other sellers.

53.  These sponsored-brand-video advertisements on William & Douglas' Amazon product listings that were out of stock or unavailable from William & Douglas but available from other sellers benefitted William & Douglas' competitors.

## V.   CAUSES OF ACTION

### COUNT ONE
**(Intentional Misrepresentation (Fraud/Deceit/Fraudulent Inducement))**
*Against Teikametrics*

54.  By reference, William & Douglas incorporates paragraphs 1–53.

55.  Teikametrics' representations to William & Douglas included:

- that Teikametrics was an Amazon-DSP-advertising expert;

- that Amazon DSP was an appropriate and effective advertising tool for third-party sellers of products with multiple other sellers like William & Douglas;

- that Teikametrics' Amazon-DSP advertisements would link potential customers directly to William & Douglas' product listings;

- that Teikametrics' Amazon-DSP advertisements would not link potential customers to any of William & Douglas' competitors' product listings;

- that Teikametrics' Amazon-DSP advertisements would result in direct sales for William & Douglas;

- that Teikametrics' Amazon-DSP advertisements would not result in direct sales for William & Douglas' competitor's selling the same products;

- that William & Douglas' Amazon-DSP-advertisement conversion rates, ROAS, and any other direct-to-William & Douglas'-products metrics were measurable and knowable;

- that the more William & Douglas spent on Teikametrics' Amazon-DSP-management services, the higher ROAS William & Douglas would receive; and

- that Teikametrics' Amazon-DSP-management services were resulting in an average monthly ROAS of nearly 7x (with a single monthly high of 13x) and average monthly product sales of over $200,000 (with a single monthly high of over $334,000) for William & Douglas.

13

56. These representations were false statements of material fact from Teikametrics' own knowledge or concerned subject matter susceptible of its knowledge.

57. Teikametrics knew that these representations were false when it made them.

58. Teikametrics made these misrepresentations to induce William & Douglas to enter into their original Contract, renew the Divisible Contracts each month, and continue to spend money on Teikametrics' Amazon-DSP-management services.

59. In entering into their original Contract, renewing the Divisible Contracts each month, and continuing to spend money on Teikametrics' Amazon-DSP-management services, William & Douglas relied on Teikametrics' misrepresentations to its detriment.

60. William & Douglas' reliance on Teikametrics' misrepresentations was reasonable under the circumstances.

61. Teikametrics' actions caused William & Douglas harm.

### COUNT TWO
### (Negligent Misrepresentation)
*Against Teikametrics*

62. By reference, William & Douglas incorporates paragraphs 1–61.

63. Teikametrics supplied the following false information to William & Douglas:

- that Teikametrics was an Amazon-DSP-advertising expert;

- that Amazon DSP was an appropriate and effective advertising tool for third-party sellers of products with multiple other sellers like William & Douglas;

- that Teikametrics' Amazon-DSP advertisements would link potential customers directly to William & Douglas' product listings;

- that Teikametrics' Amazon-DSP advertisements would not link potential customers to any of William & Douglas' competitors' product listings;

- that Teikametrics' Amazon-DSP advertisements would result in direct sales for William & Douglas;

- that Teikametrics' Amazon-DSP advertisements would not result in direct sales for William & Douglas' competitor's selling the same products;

- that William & Douglas' Amazon-DSP-advertisement conversion rates, ROAS, and any other direct-to-William & Douglas'-products metrics were measurable and knowable;

- that the more William & Douglas spent on Teikametrics' Amazon-DSP-management services, the higher ROAS William & Douglas would receive; and

- that Teikametrics' Amazon-DSP-management services were resulting in an average monthly ROAS of nearly 7x (with a single monthly high of 13x) and average monthly product sales of over $200,000 (with a single monthly high of over $334,000) for William & Douglas.

64. Teikametrics supplied this false information in the course of its business and related to its business transaction with William & Douglas.

65. In entering into their original Contract, renewing the Divisible Contracts each month, and continuing to spend money on Teikametrics' Amazon-DSP-management services, William & Douglas relied on Teikametrics' false information.

66. William & Douglas' reliance on Teikametrics' false information was reasonable under the circumstances.

67. Teikametrics failed to exercise reasonable care or competence in obtaining and communicating the false information to William & Douglas.

68. Teikametrics' actions caused William & Douglas harm.

**COUNT THREE**
**(Breach of Contract (the Divisible Contracts))**
*Against Teikametrics*

69. By reference, William & Douglas incorporates paragraphs 1–68.

70. William & Douglas and Teikametrics entered into 20 agreements (*i.e.*, the Divisible Contracts).

71. Each of the Divisible Contracts was supported by consideration.

72. By compensating Teikametrics for its Amazon-DSP-management services, William & Douglas performed its part of each of the Divisible Contracts.

73. By failing to provide Amazon-DSP-management services that directed customers only to William & Douglas' Amazon product listings and that resulted in direct sales only for William & Douglas, not its competitors, Teikametrics breached the Divisible Contracts.

74. Teikametrics' actions caused William & Douglas harm.

## COUNT FOUR
**(Breach of Implied Covenant of Good Faith and Fair Dealing (the Divisible Contracts))**
*Against Teikametrics*

75. By reference, William & Douglas incorporates paragraphs 1–74.

76. William & Douglas and Teikametrics entered into 20 agreements (*i.e.*, the Divisible Contracts).

77. The Divisible Contracts contained implied covenants of good faith and fair dealing.

78. By deceiving William & Douglas about Teikametrics' Amazon-DSP-management services' true value, by failing to disclose that the metrics Teikametrics used to induce William & Douglas to renew the Divisible Contracts each month included direct sales numbers for William & Douglas' competitors and thousands of products that William & Douglas does not sell, by failing to disclose that Teikametrics' Amazon-DSP-management services directed customers to William & Douglas' competitors, and by failing to disclose that William & Douglas' true ROAS was unknowable, Teikametrics did not perform the Divisible Contracts in good faith.

79. Teikametrics' failure to perform the Divisible Contracts in good faith destroyed and injured William & Douglas's right to receive the fruits of the Divisible Contracts and violated William & Douglas's reasonable expectations of Teikametrics' performance.

80. Teikametrics' actions caused William & Douglas harm.

## COUNT FIVE
### (Breach of Contract (the Video Contract))
*Against Teikametrics*

81. By reference, William & Douglas incorporates paragraphs 1–80.

82. William & Douglas and Teikametrics entered into an agreement for Teikametrics to provide sponsored-brand-video services to William & Douglas (*i.e.*, the Video Contract).

83. The Video Contract was supported by consideration.

84. By compensating Teikametrics for its sponsored-brand-video services, William & Douglas performed its part of the Video Contract.

85. By failing to remove sponsored-brand-video advertisements on William & Douglas' Amazon product listings when those products were out of stock or unavailable from William & Douglas, Teikametrics breached the Video Contract.

86. Teikametrics' actions caused William & Douglas harm.

## COUNT SIX
### (Unjust Enrichment)
*Against Teikametrics*

87. By reference, William & Douglas incorporates paragraphs 1–86.

88. By compensating Teikametrics for its Amazon-DSP-management services and sponsored-brand-video services, William & Douglas conferred upon Teikametrics.

89. Teikametrics knew of and appreciated this benefit.

90. Given Teikametrics' misrepresentations, deceit, and failure to disclose material facts affecting Teikametrics' services' true value, Teikametrics' acceptance and retention of this benefit would be inequitable under the circumstances without payment for its value.

## COUNT SEVEN
### (Violation of G.L. ch. 93A, § 11)
*Against Teikametrics*

91. By reference, William & Douglas incorporates paragraphs 1–90.

92. At all times, William & Douglas and Teikametrics were engaged in trade or commerce within the Commonwealth of Massachusetts.

93. Teikametrics' actions included:

- falsely advertising and misrepresenting to William & Douglas that its Amazon-DSP advertisements would direct customers only to its Amazon product listings and result in direct sales only for William & Douglas, not its competitors;

- misrepresenting to William & Douglas that its ROAS was significantly higher than in reality with numbers that Teikametrics knew or should have known were fraudulent;

- deceiving William & Douglas about Teikametrics' Amazon-DSP-management services' true value;

- failing to disclose that the metrics Teikametrics used to induce William & Douglas to renew the Divisible Contracts each month included direct sales numbers for William & Douglas' competitors and thousands of products William & Douglas does not sell;

- failing to disclose that Teikametrics' Amazon-DSP-management services directed customers to William & Douglas' competitors; and

- failing to disclose that William & Douglas' true ROAS was unknowable.

94. Teikametrics' actions are unfair and deceptive acts and practices under G.L. ch. 93A, § 2, 940 CMR § 3.02(2), 940 CMR § 3.05(1), 940 CMR § 3.04, and 940 CMR § 3.16(2).

95. Teikametrics performed these actions willfully and knowingly.

96. Teikametrics' actions caused William & Douglas harm.

## VI.     REQUESTS FOR RELIEF

**WHEREFORE**, William & Douglas requests the following relief:

1. Enter judgment for William & Douglas on all counts of this complaint;

2. Award William & Douglas compensatory and consequential damages, including interest;

3. Award William & Douglas treble damages under G.L. ch. 93A, § 11;

4. Award William & Douglas attorneys' fees and costs under G.L. ch. 93A, § 11; and

5. Grant William & Douglas all other relief this Court deems just.

## VII. JURY DEMAND

William & Douglas demands a jury trial on all issues so triable.

                                         Respectfully submitted,
                                         WILLIAM & DOUGLAS PARTNERS INC.,
                                         By its attorneys,

*/s/ Nicholas J. Schneider*

Gabriel T. Dym (BBO #667083)
Nicholas J. Schneider (BBO #688498)
ECKERT SEAMANS CHERIN & MELLOTT LLC
Two International Place, 16th Floor
Boston, Massachusetts 02110
Phone: (617) 342–6800
Fax: (617) 342–6899
gdym@eckertseamans.com

Dated: November 2, 2022               nschneider@eckertseamans.com